May it please the Court, my name is Nicolette Glaser and I would like to reserve three minutes of my time for rebuttal, if I may. Just look at the clock and see if you have whatever is left over. Maybe you could speak up a little and let me know. I apologize, Your Honors. Is that better? Yes. Your Honors, with the permission of the Court, I would like to address the three issues that were raised in the 2012 oral argument ordered by this Court. The first one that was addressed was whether we have properly exhausted the issue of breach of confidentiality under Section 208.6a of the Act. Your Honor, I would like to point the Court to the fact that before the immigration judge, that issue was not discussed, and that was based on the fact that the two letters from the Department of State, the Bunton letter and the Tungur letter, specifically alleged that the confidentiality has been upheld. However... So you accepted that? Well, we asked to actually cross-examine the preparer because we wanted to find out how that was actually being upheld and who exactly performed the investigation and under what matter. The immigration judge actually asked the opposing side to produce the witness. Ms. Tungur said, we are not producing anybody. And at that point, the judge took the matter under submission and did not really address the issue of confidentiality. So you didn't ask about confidentiality? So it's not like you said, well, if we can't examine the witness, we challenge confidentiality, right? No, we did not do that. So the IJ couldn't really address it, didn't really have any reason to address it because IJs only address issues raised to them. That is correct, Your Honor. And we have not asked for Mr. Angul to be considered for asylum based on a breach of confidentiality. What we did was, while the case was before the board, we actually specifically asked the BIA to remand the matter based on facts that have come to exist with the Alexandrov case. And I will direct the court's attention to the certified administrative record at page 19, in which we specifically told the BIA that that particular Alexandrov case has brought to the attention of everybody the fact that there were significant breaches in a pattern of practice at the consulate in Bulgaria of breaching the confidentiality of asylum seekers. And what we did, we appended... Alexandrov was in 2006, right? That's 2006. April 4, 2006. That was after the close of the administrative record in this matter, yes. But at the time you were before the BIA. Correct. So what we did is we asked the court to give us a chance to consider, because it was directly impeaching and brought into the attention of us and everybody else, what was actually happening in the Department of State. So the remand motion is what you exhausted. That's correct. And the BIA actually addressed the remand motion in their order and says, we are denying the motion to remand. Now, they didn't tell us why, other than saying, we are not going to consider what they call the unpublished decision from the Sixth Circuit. I don't believe that the court at this point can properly review whether the board was not satisfied with the reasoning of the court in Alexandrov or it didn't find that it was applicable to this case. What we asked the court to consider, also, is the fact that the 208.6 places the obligation on the government to uphold confidentiality. And the Cooper Memorandum specifically addressed how that should be done. Now, the Cooper Memorandum was in existence, was never provided to us despite the fact that the IJ repeatedly asked, what is the authority that DHS has to conduct those overseas investigations? And I kind of fudged the question. I think you're getting a little far afield. The question is whether you raised the claim under 208.6 before the – did you exhaust that claim? I believe what our position is that we have exhausted it before the board and the board spoke. Where in the record do you raise 208.6? It's page 19 in the motion to remand. We are – that's the specific position. Do you have that right in front of you? Yes, Your Honor. Where in the administrative record? What page on the administrative record? It's page 19, Your Honor. Oh, it's page 19 of the document. What page of the? Of the AR. Administrative record 19. 19?  And it says, Your Honor, if I may, Respondent respectfully submit a copy of the Alexandrov. The document is submitted to document a pattern and practice of procedural and substantive violation of the law and applicable regulation of the consulate in Sofia during overseas investigation in divulging the identity of an asylum applicant to the authority of Bulgaria in violation of CFR 208.6. And this is the motion to remand that at page 2 has been addressed. The respondent also moves to remand the proceeding to supplement the record with a non-presidential decision from the United States Court of Appeal for the Sixth Circuit. The motion will be denied. I think the – I'm somewhat confused. What's the non-presidential decision from the Sixth Circuit? I believe they thought that the Alexandrov case was a non-presidential decision. It's not. It's an opinion. It's appended. It's actually included in the record. Designated as an opinion and they called it non-presidential? Yes. And we actually appended the actual Alexandrov case to that brief at pages – Certificate of Administrative Records 20 and thereafter. Your Honor, if I may address the two cases that were – the three cases that were identified in that May 2012 order, the Banat from the Eighth Circuit, the Lin case from the Second Circuit, and the Borovikova case from the Second Circuit very quickly. Both the Banat case, the Eighth Circuit published case, and the Lin case from the Second Circuit actually announced the consensus opinion from other circuit court that when we have a Department of State report, the government must lay proper foundation to establish that trustworthiness and reliability of the overseas investigation. And the Banat case, I will point the fact it was the – it addressed a Tungur-authored letter, same individual who authored the second opinion in this case, and they found that that particular decision – letter was awfully unacceptable and it was fundamentally unfair. The Banat case specifically pointed to the Cooper memo and distilled the requirement of the Cooper letter for – to lay a foundation saying – Talk to me about the Cooper memo. What effect does the Cooper memo have? Well, Your Honor, our position is that the Cooper memo exhibits or states the position of the government, what needs to be done in order to comply with the burden they have under 208. I realize that's what it says. The question is what legal effect does it have? Well, the only legal effect we – I believe he has, it states what must be included into a report of investigation. I understand that's what it does. The question I'm asking you, what legal effect does it have? I believe the legal effect is it goes to what is required from a report to be trustworthy. Under due process? Under due process. Are you familiar with other areas of the law, for example, multiple prosecution where the Supreme Court has held that internal documents of the Justice Department cannot be held to be binding against them or rise to the level of constitutionality for any number of reasons that I won't go into. It seems this is somewhat similar. Trying to hold them to the Cooper memo is a little bit like trying to hold the department to internal memos, and they say that you just can't do that. I agree that there is definitely a support for that position. I think what – No, I think you're not understanding. You're not agreeing, are you? No, I'm not agreeing that it's akin. I think with the criminal cases and – Why not? If you disagree that it's akin. Because I think what we have in the act, in 208, actually is unique in a sense that it places and makes it an obligation of the government, meaning they must comply with that rule any time they – All internal policies of the government. If you're in a department of the government, you don't comply with your own policy, you're in trouble. That is correct. You shall comply with your policy. So what differentiates this from other areas? Well, I think, again, I think what is different is that the applicants, any asylum, any alien have no way of establishing or monitoring how that confidentiality is upheld because a lot of time people don't know that an overseas investigation has been conducted. And any time that – In this case, you did. Yes. You got an investigation. You got a chance to put in rebuttal evidence. Your client put in rebuttal evidence. The IJ saw the rebuttal evidence and decided to disbelieve your client. So what's the problem here? Well, I think the problem is that the judge – This wasn't sprung on you. This wasn't like you came to the hearing and they said, here you go. You had notice. You had lots of time. You didn't ask for more time. You could have asked for more time. You didn't ask for more time. So I don't see what the due process problem is here. Well, the due process first is, Your Honor, the Section 240 of the Act allows an alien to cross-examine the witnesses presented against him. Oh, sure, witnesses. But that's not witnesses. That's an affidavit. Where does it say you get to cross-examine here, say, the clients? Well, Your Honor, this was not an affidavit. If it was an affidavit – I'm sorry. It was a letter. Where does it say that you cross-examine somebody that's not a witness? That's why it's a letter. Well, Your Honor, I think the – I mean, your client introduced all sorts of statements or letters from other people who can't be cross-examined, right? That's how IJ immigration hearings are. That's correct. And in this case, the government did not object to our submission. We specifically objected on the admission of this letter by not being trustworthy enough and not containing enough information for the IJ to look and see was that – were safeguards made and protected so that what I'm having in front of me allows me, as the trial of fact, to determine that this particular evidence is trustworthy and the rest he knows. You were able to point that out to the trial of fact, right? Yes, we were able to. Okay. So the trial of fact had the letter. It had your argument as to why it shouldn't be trusted. It had the contrary statements of various evidence that your client submitted in rebuttal. I mean, I don't – I still – I'm not seeing the problem here. Well, the IJ – Where is the denial of due process? The IJ – Is your position that every time the United States, the Department of State, or some foreign official does an investigation that they have to be brought to the United States to testify? No, Your Honor. Our position is that as long as the – it's an actual investigative report which states who conducted it, how they conducted it – You're going back to the Cooper memo. And both the Lynn, the Bonat, and the Niem cases, which are – But those are cases out of circuit. We don't necessarily accept them. So you can – I know what they say. And the question is why should we – insofar as they're instructive here, insofar as we should follow them. Well, I, for one, am just not persuaded. I'm not buying it. It seems to me our State Department does all sorts of investigations abroad, and if we had to transport every time somebody writes in a report investigation, we have to transport them here as a matter of due process, you'd never have the – you'd never have such a report because the State Department just can't afford to send people, consular officials back here to cool their heels for immigration hearings. They would never get anything else done. No, Your Honor, that is correct. However, they could testify over the phone, or they can produce actual reports that say how an investigation was done and how it – They might. They might. But the question is not whether they might do something else. The question is whether doing it the way they're doing it is a denial of due process. And if you have a chance to know what they say, you get your own people to go out there and take photographs or, you know, whatever, and the IJ sees it, where's the denial of due process here? Well, I think the due process is that an alien has the right to full and fair hearing and also has the right to have the statutory right promulgated by Congress in Section 240. Those involve that any hearsay is fundamentally fair and reliable. Unless there is a detailed investigation, the IJ abdicates his role in determining whether that's trustworthy or not. Fundamentally fair and reliable? You think having a consular official do an investigation is not fundamental? You know, what about the presumption that the government officers follow the law and they don't have a stake in this controversy. It's not like anybody pays them to. It's not like they know your guy and are trying to keep him out. They're doing their job. What's fundamentally unfair about that? In this case, it's because it was not the consular officer who conducted the investigation. It was a former police officer, a foreign national, who went to his own former employer and said – Now, all right. Now, I may have missed something. Where does it say it was a foreign national? It says we employ foreign nationals sometimes. A foreign national did this? Well, I think, firstly, before the IJ, it was undisputed. We both sides agreed that this was a foreign national who conducted it, and Tanya Tongor, in essence, confirmed that after she was asked to produce the – I'm sorry. Where does she do that? All she says was sometimes we use – Is this in the Tongo letter? Yes, Your Honor. I'm looking at the Tongo letter. It's ER-426. I've got it. AR-426. Because of the large volume of requests for information, the Department of State employs foreign service nationals at some post to conduct local investigations. But, Your Honor, in this way, we have asked the – Where does it say, as you said, that a foreign national did this? Well, Your Honor, the cryptic letter of the Tongor prevent us to find out what we've discussed. Well, about a minute ago, you said a foreign national did it. Well, I think what we have discussed before the IJ, and based on what's happening at the Consulate in Sofia, at the time of the individual hearing, I proffered to the IJ that I actually know the identity of the individual who conducted this, and that's why I wanted to cross-examine that. Is that in the record? It is in the record. And you know who did this? I do know who did that, yes. And it was a foreign national? It is, Your Honor. Did you take any steps to bring that person in? I asked for all the – I did a FOIA to the Consulate. I did a FOIA to the Department of State. They refused to return any evidence. And how do you know? I mean, you were not in the oath. Where is this exchange in the record? If I may look at the trial. You must. Yeah, you've got it. Yes, Your Honor. There's no may about it. Do you want to maybe look that up and tell us – I'll give you a minute to have a bottle. Yes, Your Honor, if I may. How is it – I mean, you're not ready to sit down and just know there's something you can give us on the board. How is it that your client's identity was necessarily compromised by whatever was done by whoever did it? I mean, this was a subpoena. It wasn't a certificate of release. It was a subpoena. If you look at the letter from Ms. Bunton, she said the consulate requested authentication of the subpoena from the Fifth Police Department in Sofia. Now, the fact that they're asking for authentication, they did it under the Hague Convention for Apostyle, which requires – Bulgaria is signatory to that particular convention – requires that the signature be confirmed. So in order for them to authenticate, they must – and there's no indication that that's not the case. They simply provided the subpoena. And if you look at the Bunton letter – But you can conceal the details. You can redact, can't you? Yes, you could, except in this particular case, it does not appear that they took any effort in doing so. Well, they say they did, but that may not be dispositive. Well, I think, again, the Lynn case said what is required is whether under 208, there is indicia that will raise basis to an inference for the foreign official to determine that this is an asylum case. Now, in this particular case, we're not talking about birth certificate. We're not talking about identity document. We're talking about a police subpoena that was – But you can authenticate the signature. I know how apostyles are gotten because I get them all the time in the United States. What you do is you authenticate the signing official by getting somebody else to look at the signature and say, oh, yes, this is, in fact, a notary public. They compare the signature in Sacramento. It's like you know how to get an apostyle. That is question. And so the State Department, California State Department officials will say, okay, this is a real signatory. They don't have to look at the document. They don't have to see what the document says. You can blank out. You can conceal. You could even sort of cut off the parts of the document that have the proprietary information and get an authentication of the signature. Well, I believe, Your Honor, that the – You can, right? You could, but I think under the Hague Convention, I believe there is also a requirement that the person who's authenticating the signature, if it comes from the issuing authority, they verify that the document is authentic, too. So a police official or the Bulgarian authority cannot say this document is authentic unless they see the actual document. So if, in this particular case, if the government went in and says authenticate this document, they have to show the actual document. If they went and said, look, we need to find out if you have a record of a subpoena number 13-14-16, and then – You're surmising this. This must have happened. You don't have any information to that effect. No, Your Honor. That may be all you can do. And the only way anybody, the prior fact, this court or anybody will know is if we had had a chance to actually cross-examine. What is it on the face of the subpoena that suggests that the person who's named in the subpoena is an applicant for asylum? Well, what implies is, Your Honor, this is a gypsy individual who was brought to this particular department and he was arrested because a non-governmental agency in Bulgaria, defending Roma, wanted to use his case to make a plea before the Pope. So it was this particular police department they told them, look, you better stay silent. So that necessarily suggests that he's an asylum applicant because it's an American – well, it wasn't an American official, it was a foreign national. We don't even know that the foreign national identified himself or herself as an agent of the embassy. We don't know. I mean, I have suspicion and I could have made a proffer and I could have gone into cross-examining based on my personal experience with this particular consul. Maybe your best argument is they gave him the case number. The case number. And you can walk a case number backwards and find out exactly who it is. That is very true, Your Honor. And again, I want to point out – Did they give the case number? Well, the case number is on a subpoena. In the letter it says the embassy that the case numbers on the subpoena were not correct, so they must have seen the case numbers. Correct. And it's, after all, a communist country that has a pretty poor record with Roma rights, so probably they have a way of numbering their subpoenas so that they – Is there an explanation in the record for the absence of the two seals somewhere that one could look at and see that one's larger than the other? Well, Your Honor, again, we asked for the exemplar. They refused to provide it to us, and again, it was not clear. I mean, they didn't have the original subpoena, so I don't know in what format they presented it during the authentication problem. If it was shrunk, if it was augmented in a problem of the process of reproduction, it may have looked bigger or smaller. Now, again, we don't know if we're talking about inches or we're talking about, like, centimeters or millimeters of difference. But, again, they did not have the original subpoenas because they were kept in the court's file. Let me ask you one other specific question. One of the documents you proffered by way of rebuttal is a letter from Daniela Mihailova. Yes, Your Honor. I'm having trouble seeing. Is that the name? And paragraph 1, she refers to Sofia-based address number 5, 3005 Street. Correct. Now, if I understand correctly, your client referred to number 9, and the bundle letter says there is no number 9 at 3005 Street. That is correct, Your Honor. Now, by way of rebuttal, Ms. Mihailova is a woman, Daniela? Yes. Says there is a number 5. It doesn't seem to be the same number. Well, Your Honor, the undisputed- Am I reading correctly? It's correct. The number 9 was destroyed. That was the testimony, Mr. Vangoff. No, I understand the explanation, but I just want to make sure we're tracking. He says number 9. Buntin says there is no number 9. Rebuttal is there is a number 5. Well, I think the way I- Just listen. Yes, Your Honor. Am I reading this correctly? Correct, Your Honor, except Buntin said there's no Street 3005. I don't think so. 3005 Street is very short with both old houses and a few newly built blocks of flats. That's correct. I apologize, Your Honor. And says there is no number 9. Correct. Okay. So then the answer comes back is there is a number 5, which doesn't speak to number 9. And does it say anywhere that number 9 used to be there and was destroyed? No, Your Honor. I don't see how- That's your statement. Well, the testimony of the applicant is I lived in number 9. This is my ID. They came in and raised it to build a supermarket. But I'm trying to- You know, this is not a place for testifying. You're not a witness. Yes, Your Honor. I'm trying to get straight what's in the record. Your client said number 9. Buntin said there is no number 9. Correct. Mikhailova said there is a number 5. That is correct. And then you come in and say number 9 was destroyed. But that's your statement. That's not in the record. Mr. Lankov, the applicant testified throughout the hearing and in his declaration that his house, number 9, was raised in order for a supermarket to be built. He does. So that's based on his testimony. And that's why he was moved with other people from the same neighborhood to the Evropa Boulevard, which is the second address that is- 175 Evropa. Correct. Okay. All right. Okay. We'll give you a minute for rebuttal. Thank you. And remember what we asked you. Yes, sir. Okay. We'll hear from the government. May it please the Court. My name is Jesse Buse and I represent the Attorney General. I'll first address the same exhaustion issue that Petitioner's counsel addressed. Petitioner's counsel admitted that this was not the confidentiality issue was not raised before the immigration judge. It was not factually developed there. She alleges that she raised the confidentiality issue on appeal to the board by stating in her motion- in her brief that she was seeking remand based on this Alexandrov decision and alleged that Alexandrov stood for this very broad proposition that there was a pattern of practice of revealing information to the authorities in Bulgaria. Alexandrov does not stand for that proposition. The facts of Alexandrov are specific to that case. It had to do with the investigation in that particular circumstance. Notably, Alexandrov didn't address confidentiality. It did not address 8 CFR Section 208.6. The board denied the motion to reopen or the motion for remand solely on the basis that this was not a presidential decision, that it was not-this is a Sixth Circuit decision, not a Ninth Circuit decision. So the board- Was the board confused as to whether it was published? And if so, does that make any difference? The board was not confused in this case, Your Honor. The board stated it was a non-precedential decision. It was referring to the fact that it's non-precedential within the Ninth Circuit. It's a Sixth Circuit decision, and it's not binding on this Court, as Judge Kaczynski noted, that other Circuit decisions, even published ones, are not binding upon the Ninth Circuit. True, but I've never seen them refer to other decisions in that fashion. It may or may not make any difference. But usually they say there is this case, but it doesn't apply because this is a Ninth Circuit. It arose out of the Ninth Circuit. They don't say non-precedential. Well, in this case, it's not- I'm not quarreling with you. I'm just saying this. I'm not sure we can attach significance one way or the other to this. But go ahead. You're saying that's not enough to exhaust. Yes, Your Honor. The alien here, or Petitioner here, never stated that there was any issue with confidentiality in his own case. In fact, the only mention of confidentiality- Isn't it implied in asking for a remand so they can examine that issue? Well, they were asking for remand to consider Alexandrov based on this- No, to consider their own case in the light of Alexandrov. Which, as I noted, Alexandrov does not address the confidentiality provisions. Right. Here's what she says. I'm sorry to interrupt. Here's exactly what she says in the motion to remand. They wanted to- I'm sorry. The document is submitted to document a pattern and practice of procedural and substantive violations of the law and ethical regulations by the Consulate in Sofia during overseas investigations and in divulging the identity of asylum applicants to the authorities in Bulgaria in violation of CFR 208.6. So she's raising confidentiality. She's raising it- It's not just based on that Alexandrov decision alone. Well, she's not raising it, or Petitioner didn't raise it with respect to his own claim. Why would they want remand then if it's not- I don't get that. Of course they're raising it with respect to their own claim. Well, there's never been an allegation that confidentiality was violated in his own case. The letter, the button letter that was submitted states that the asylum application was never divulged, was never raised before DIJ, and never stated in their own appeal brief that confidentiality was violated based on the facts of this case. They're asking for remand. Is that the remand to flesh out the facts to determine whether it was or wasn't? That is true, Your Honor. But as I stated, they're asking for remand based on this Alexandrov decision, which, as I said, had nothing to do with confidentiality. Well, they're also asking for remand based on the provisions of the rule. Well, they're only mentioning the rule in the context of stating what Alexandrov supposedly stands for, which it simply is not the case. What says divulging identity of asylum applicants to authorities in violation of that? Why don't you think that raises confidentiality? Again, because it's – the question for exhaustion in this court is whether the board is put on notice and the issue has to be presented and the board has to be put on notice that this was an issue. By failing to make any allegation that confidentiality was an issue, specific issue in his case, the board simply wasn't put on notice. The only – Well, that's an awful thing. Maybe you'd better move to your next argument. Well, let me – a petition didn't raise it before the IJ, right? No, Your Honor. And then he gets before the board and he makes his motion to remand. Yes. Just in terms of timing, this happened after the briefing in the case? No. The motion to remand. The motion to remand was in the brief. It was the last – The last section of the brief. Yes, Your Honor. So there's a motion for remand. And what is – does the board deal with the motion for remand? The board, at the very beginning of its decision, states that it's denying that the respondent is seeking remand based on a non-precedential decision. On what page? What page are they? Page 2. Page 2, yes. Okay. And so they deny it. So what is the standard for the – by which we review this? Denial. This is not raised before the IJ. Something comes up that they think merits a remand. Something happens. Alexandrov came after the proofs were closed before the IJ, right? After the IJ issue. And – Per decision. Under what circumstances does the board – what standard do they apply in deciding whether something is remand based on evidence that comes – something that happens afterwards? Well, the standard is the same for a motion to reopen. In this case, I believe it would be whether there's new and material evidence to – So we can take this to be a determination by the board that this is not new or material in the case, and they are refusing it. And how do we review that decision? For abuse of discretion, Your Honor. Again, the same as for a motion to reopen. Under Hinkson. Under a Hinkson decision, right? I'm not sure of the specific decision for that purpose. You're walking into our court without knowing our standards for abuse of discretion. It's like taking a life in your hands. The standard is for abuse of discretion. Let me – Okay. Very quickly. So that's how we review it. Does the BIA standard for a motion to remand is identical to the motion to reopen? Under matter of Coelho, the board stated that it reviews the motion to remand under the same standard that it reviews a motion to reopen, Your Honor. The same criteria? I believe so, Your Honor, yes. That it uses the same criteria for a determination. It's essentially something that happens after a decision is made. Yes, Your Honor. In their plan. Okay. Do you have a cite for matter of Coelho? Oh, I believe – Maybe you can come up with it later. I don't have the cite directly at hand. I believe – Maybe you can provide the first citation. I believe that it might have been cited in – no. Why don't you provide the clerk citation and we'll copy the counsel. Yes, Your Honor. What we used to call a gum sheet, but we don't have gum sheets anymore. I missed a gum sheet. Maybe it's sticking out. Yes, Your Honor. Okay. Go ahead. The – I would say that if the court does – neither the confidentiality issue by admission was not raised before the IJ. And here the board – Everybody agrees on that. Right. I'm simply stating that should the court deem this issue exhausted, which is then it would need to go back to the board for a determination in the first instance because we don't have any factual predicate for determining whether confidentiality is – Going on to the merits of the asylum claim, you're not keen on Alexandrov and Barnard and those cases, right? Your Honor – You said that in a footnote in your brief, but you didn't really go at any length to explain why. Well, Your Honor, each of those cases is distinguishable. With respect to – of course, there were two cases that the court asked for us to address, Borovikova and the Second Circuit, but not in the eighth. I would note that – There's also Third Circuit cases, isn't there? The Lynn case? And the Lynn case, yes, which goes to the confidentiality. Is Lynn in conflict with the other Second Circuit case, Borovikova? It does seem to be somewhat in conflict because in Lynn, the issue turned on the standards under the Cooper Memo, which, again, as the court indicated, is not binding upon the government because it is not a statute of regulation. It's simply internal guidance. That's true, but then the Second Circuit went on and sort of distilled the Cooper Memo and said, well, you've got to have some indicia of reliability. If we applied the Second Circuit's approach to this case, what does that mean for your position? Well, I would cite to Borovikova in this case, which involved – No, no, I'm asking a different question. Assuming hypothetically, and it's purely hypothetical, if we adopted the Lynn standards, does your case survive? I would attempt to distinguish Lynn on the facts here, to state that there is a greater indicia of reliability with the report that we have here. Most of the cases that have been cited, the Bonat case, the Alexandrov case, the Anim case, don't go into much detail with respect to the actual investigation that took place. And here – and there were also, in many of these cases, no opportunity for the petitioner to respond to the evidence presented by the government. That was the issue in, I believe, in Alexandrov. And at least in Alexandrov, that was an issue. It certainly was an issue in Sianapan, right, our case. Well, let me be specific. Yes, Your Honor, that was the issue in Sianapan. So Lynn says at least three useful factors may be distilled from this memo referring to the Cooper memo. The identity and qualifications of the investigators, two, the objective and extent of the investigation, and three, the methods used to verify the information discovered. If we apply those standards to this case, what does it mean for the government's position? Well, I would argue that, as far as the first one goes, that there is sufficient – there's sufficient evidence to indicate the qualifications that the people have to – we have an embassy official who's investigating this claim. It's identified as an embassy official. So we don't have the identity of everybody? Excuse me? We don't have the identity of anybody? We don't have the names of the people in this case. The qualifications are embassy official and Bulgarian official. Time out. Where do we know that it's an embassy official that did it? I mean, the other side is saying that they know that it's a foreign national that did it. Well – The letter says the embassy contacted. It doesn't say how. It doesn't mention a person. The Bunton letter indicates that there was an embassy official who was responsible for the investigation in this case. That's at the very end of the first paragraph of that letter. The U.S. embassy official responsible for the investigation is aware of the confidentiality provisions of U.S. asylum law. Okay, but that doesn't mean necessarily that that was the person who went to the police station and did whatever was done with this subpoena. And then you've got the Tonger letter that says, hey, guess what, every once in a while we use foreign nationals. That's true. I don't think it's as clear as you're indicating that it was an embassy official that actually made the contact. It says the embassy. That is true, Your Honor. It does only mention the embassy is responsible. It doesn't specifically mention an embassy official, although there was an embassy official in charge of the investigation here. I would note that we don't have an identity for the official contacted in the 5th Police District, but we know that that was an official in the archive department of that district, which would presumably be somebody who would – What does that mean? Excuse me? What does that mean? That it was an official within the archive department. What are the qualifications of someone who's an official in the archive department? We can presume that it's somebody who is capable of determining whether a police record in this case is official if they were in the archive department at that police station. Is it the archive department that issues subpoenas? No, Your Honor. In this case, it was on the basis of the subpoenas itself. The subpoena appears to have been issued by – allegedly issued by an officer within the 5th Police District. But moving to the other two bases. Are the subpoenas on the record? Yes, Your Honor. I can give you the page number. The subpoenas are at pages 605 to 609 of the administrative record. 605 to what? To 609. It's translation and the original copies. Okay. Got it. But with respect to the other two factors, we have information about how these two subpoenas were determined to be inauthentic. The officers who allegedly – who were mentioned in the subpoenas allegedly never worked at the 5th Police District. The case numbers of the subpoenas were not correct. The room numbers and telephone numbers were incorrect. And that's more than the – the conclusory statements that have been found to be insufficient in other circuits in determining the reliability of these reports. And the final factor? The final factor was –  Exactly, Your Honor. In this case, I would argue that that kind of collapses into the matter of the investigation, that the – that we know the basis. We know that these were the standards that were used to determine the authenticity of this affidavit. This is, I guess, a question for both sides. Did anybody pick up a telephone in the United States and try those phone numbers to see whether it was true that they were incorrect? As far as – Let's see if you can pick up a telephone, call the number, and see whether – who answers. Joe's Lock and Key Shop or the police station? As far as I know, no attempt was made. Nobody even did – you could verify that right from the courtroom almost. Right. As far as I know, no attempt was made. It's not – as far as I know, it's not indicated in the record whether any attempt was made, I should say. But I notice my time is up. If the Court has any more questions. Okay. Thank you. And I will rest. Thank you. We'll give you two minutes for rebuttal. I think we're all impressed with the level of detail that you've used in digging into this case. Did you ever call those phone numbers to see whether they worked or not? Actually, I did. You did? I was directed from the Ministry of the Bulgarian Internal Affairs to the webpage, and that's how I was able to verify that the idea was correct. But I was told that there was a relay system that was implemented in all governmental agencies, so they switched to different phone numbers. So I actually – I had a feeling you probably tried to call those phone numbers. And did you ever get the police station? No, nobody answered. Okay. I found the real number, and nobody answered. Sounds like police stations in some place around here. Unless you call 911, but if you just make a routine call, sometimes it takes a long time. I know I exhausted my time, but the Court asked me for the page of the record when I made the allegation that I know who did it, and that is Certified Administrative Records, page 332, lines 10 to 18, and 333, page 1 to 4. Okay. 332, what? 332, and those are lines 10 to 17, and 21 to 25. Okay, that's you saying you know who did it. Correct. And on the next page, I have the impeachment evidence, but if I don't have the person and we don't have the name, they omitted it, I cannot impeach them. So precisely what are you asking us to do, if we were to agree with you? Are you asking us to overrule the Board's decision to refuse to remand, to reopen, is really what it was, and to send it back all the way to the IJ for factual development on the confidentiality issue? Is that what you're doing? That's correct, Your Honor, because I think the only issue is we have asked to develop the facts, and only if we can develop the facts can the judge actually make a determination to admit this document properly. So you want to walk it back all the way to the IJ? And then decide what kind of weight to give, and if the court will look at even the comment of the IJ saying, I went so back and forth, I was a ping-pong player. He clearly made it clear that he was not, he didn't know what to believe, and it was all about the records that was presented, and he had to side either one side or the other. So we are asking the court to just send it back for further development of facts. Okay. Thank you. Thank you, Your Honor. The case is argued. We'll stand some minutes. We'll next hear argument in Freeman Investments v. Pacific Light.
judges: Kozinski, Trott, Thomas